UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
MARIA A. VELEZ,

                Plaintiff,

     -against-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.
-------------------------------------------------------------- x

**REPORT AND**
**RECOMMENDATION**

14 Civ. 3084 (CS)(JCM)

To the Honorable Cathy Seibel, United States District Judge:

      Plaintiff Maria Velez ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g)

and/or 42 U.S.C. § 1383(c)(3), challenging the decision of the Commissioner of Social Security

("the Commissioner"), which denied Plaintiff's applications for Supplemental Security Income

("SSI") benefits, finding her not disabled. Presently before this Court is the Commissioner's

Motion for Judgment on the Pleadings ("Motion") pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure. (Docket Nos. 13, 14). The Commissioner's Motion was filed on December 15,

2016, and Plaintiff's response was due by January 17, 2017. (Docket Nos. 10, 13, 14). However,

Plaintiff did not timely respond. By Order dated February 3, 2017, the Court extended Plaintiff's

time to respond or otherwise notify the Court as to her status until March 3, 2017. (Docket No.

15). Plaintiff did not respond, and the Court deemed this matter fully submitted. For the reasons

that follow, I respectfully recommend that the Commissioner's Motion for Judgment on the

Pleadings should be denied, and the Commissioner's decision be vacated and the case be

remanded for further proceedings consistent with this Report and Recommendation.

## I. BACKGROUND

Plaintiff was born on November 20, 1972 in Puerto Rico. (R.[1] 25, 65). She completed eleventh grade and received special education for dyslexia. (R. 25-26, 91-92, 258). She is bilingual, and speaks English and Spanish. (R. 258). On her application for SSI, Plaintiff stated that she was "self-employed as a house cleaning lady" from 1997 through 2007.[2] (R. 69, 88-89). Plaintiff filed her application on October 24, 2008, alleging that her disability began on January 5, 2008. (R. 68, 72). She alleged that she could not work due to a nervous condition, depression, insomnia and body aches. (R. 87).

The Social Security Administration ("SSA") denied her application on April 22, 2009. (R. 39-42). Plaintiff disagreed with the decision and requested a hearing before an Administrative Law Judge ("ALJ"), (R. 43); the hearing was held on May 14, 2010, (R. 20-33). On July 21, 2010, the ALJ found that Plaintiff was not disabled under the Social Security Act ("Act"). (R. 7-16). Plaintiff appealed the ALJ's decision to the Appeals Council, which denied her request for review on February 7, 2012. (R. 1-3). Thereafter, Plaintiff commenced a civil action in this District on April 10, 2012. (R. 334-36; *see also Velez v. Comm'r of Soc. Sec.*, No. 12-CV-2824 (S.D.N.Y.), Docket No. 2). By stipulation of the parties, that action was remanded to the Commissioner for further administrative proceedings on September 12, 2012. (R. 342-43; *see also* R. 344-47; *Velez*, No. 12-CV-2824, Docket Nos. 15, 16).

On June 7, 2013, Plaintiff appeared for another hearing before a second ALJ, ALJ Sheena Barr.[3, 4] (R. 306-23). In a decision dated November 14, 2013, ALJ Barr found that Plaintiff was

---

[1] Refers to the certified administrative record of proceedings ("record") related to Plaintiff's application for social security benefits, filed on the Court's Electronic Document Filing System on December 15, 2016. (Docket No. 11).

[2] The ALJ nevertheless found that Plaintiff had no past relevant work. (R. 300).

not disabled under the Act. (R. 291-301). On January 17, 2014, with the help of a non-attorney

disability advocate, Mark Ramnauth, Plaintiff requested that the Appeals Council review the

ALJ's decision. (R. 324-31). Plaintiff set forth several arguments, which she claimed were non-

exhaustive, and requested that if the Appeals Council limited its review to the issues raised in her

letter, she be provided the opportunity to submit additional arguments. (R. 324-31). On March

10, 2014, the Appeals Council acknowledged receipt of Plaintiff's letter and directed Plaintiff to

submit any additional arguments and/or materials within thirty days. (R. 287-90). It appears that

neither Plaintiff nor the Appeals Council took any further action; thus, the ALJ's decision is the

final decision of the Commissioner subject to review. Plaintiff commenced the instant action,

proceeding *pro se*, on April 21, 2014, challenging the ALJ's decision. (Docket No. 2). The

matter was referred to the undersigned by the Honorable Cathy Seibel by Order dated July 28,

2016. (Docket No. 7).

## A. Plaintiff's Medical Treatment History

The record reflects treatment Plaintiff has received for her mental health and for opiate

dependence. (*E.g.*, R. 138).

## 1. Bronx-Lebanon Hospital Center

Plaintiff presented at Bronx-Lebanon Hospital Center ("Bronx-Lebanon") on September

18, 2008, where she participated in the Inpatient Substance Abuse Service to detox from heroin.

(R. 160-62, 183-84). Plaintiff reported that she had used cocaine as recently as one month

---

[3] On June 3, 2013, Plaintiff, through her non-attorney disability advocate, Mark Ramnauth, requested a pre-hearing review, asking that the ALJ decide the case without a hearing. (R. 395-98). Plaintiff made the request because it had "been a long time" since she left her apartment, and because, "based on her anxiety and frequent panic attacks, it [would] be difficult for [Plaintiff] to attend the hearing." (R. 395). Plaintiff's advocate requested to be informed by telephone whether the request was granted. (R. 395). Because the hearing proceeded as-scheduled, the Court assumes that the ALJ did not grant this request. (*See* R. 306-23, 360-66).

[4] The Appeals Council provided specific criteria for the ALJ to consider on remand, discussed *infra* Section II(F).

earlier, that she had started using cocaine at age twenty-five, and that she used on average "three bags" per month. (R. 161). She further reported that she used heroin for the first time at age thirty-five, that she used on average "two bags" per day, and that she had last used that day. (R. 161). Plaintiff was evaluated by Caleen Warren, a nurse practitioner, who noted that Plaintiff was nervous, suffered from major depression, and had a history of insomnia and auditory hallucinations. (R. 183-84).

From March 1 through March 4, 2011, Plaintiff was hospitalized at Bronx-Lebanon for an overdose and attempted suicide. (R. 508-36). She stated that she "overdosed with the pills," and described taking four 2mg Xanax pills, combined with alcohol and cocaine. (R. 508, 511, 516). Plaintiff further described an argument with her daughter that had led her to want to "hurt herself," and to attempt suicide. (R. 508, 516, 522). Plaintiff's husband had called 911 because Plaintiff was sedated and difficult to wake up; emergency medical services brought her to the emergency room. (R. 516, 520, 527). Upon psychiatric evaluation, Dr. Ricardo Alvarez noted that Plaintiff was regularly treated by Dr. Francis Hayden. (R. 527). He found that she was alert and oriented "x3," that her affect was full and stable, that she was coherent, and that her mood was "okay," but that she was "concerned over confusion last night." (R. 528). After several days of treatment and observation, Plaintiff was discharged on March 4, 2011. (R. 526). Dr. Rubio Valerio noted that her mental status was "returned to baseline." (R. 526).

## 2. Dr. Martin Luther King, Jr. Health Center

Plaintiff was treated at the Dr. Martin Luther King, Jr. Health Center ("MLK Health Center") from July 2008 through May 2013. (R. 137-52, 154-58, 163-82, 185-202, 209-10, 454-507). For her mental health, it appears that Plaintiff was treated primarily by Francis Hayden, M.D., whom she saw for psychotherapy and medication management; Marina Cozort, M.D.,

with whom Plaintiff had additional psychotherapy; Christopher Leggett, Ph.D; and Orlando Bosch, L.C.S.W. (*E.g.*, R. 150, 168, 177, 453, 493). Plaintiff also had frequent appointments with Joseph Tiburcio, M.D., and Maged Barakat, M.D., for primary care and medication management. (*E.g.*, R. 168, 170, 479).

During the eight-month period from July 2008 through March 2009, Plaintiff was seen frequently by Drs. Tiburcio and Hayden: she had at least eleven appointments with Dr. Hayden, (R. 138, 139, 144, 147, 149, 151-52, 154, 156-57, 167-68), and at least six appointments with Dr. Tiburcio, (R. 143, 155, 163, 165, 169, 170). Plaintiff's first appointment with Dr. Tiburcio was on July 2, 2008. (R. 170). From her first visit with Dr. Tiburcio through March 30, 2009, Plaintiff consistently answered "yes" to the following questions: (i) whether she had often been bothered by feeling down, depressed or hopeless over the past month; and (ii) whether she had often been bothered by having little interest or pleasure in doing things over the past month. (*E.g.*, R. 139, 170). After her second appointment with Dr. Tiburcio, on July 15, 2008, he prescribed Plaintiff Seroquel and Trazodone for her mood disorder. (R. 169). He also referred her to Dr. Hayden, whom she first saw on July 29, 2008 for anxiety and depression. (R. 168). At her first appointment with Dr. Hayden, Plaintiff reported having anxiety attacks accompanied by sobbing, palpitations, trembling and sweats over the previous two months. (R. 168). She was also fearful, and suffered from insomnia and anhedonia. (R. 168). When she went outside, she felt that everyone was looking at her. (R. 168). Plaintiff described auditory hallucinations, explaining that she would hear her mother's or husband's voice calling for her and would believe it was real, but that her mother and husband denied calling for her, which made her cry. (R. 168). She described losing her two-year-old daughter in a house fire in Georgia fourteen years earlier, and complained of stress associated with the birth of her grandson to her fourteen-year-old

daughter. (R. 168). Upon mental status examination, Dr. Hayden found that Plaintiff spoke rapidly, shifting between English and Spanish, exhibited panic symptoms, had strained impulse control and decreased concentration. (R. 177). He evaluated her Global Assessment of Functioning ("GAF") as forty-five, and opined that her highest GAF over the past year was likely fifty-five. (R. 175). However, he found that her insight was fair to good and that her judgment appeared to be good. (R. 177). He concluded that Plaintiff was suffering primarily from anxiety, which seemed to have graded to depression. (R. 177). Plaintiff felt that the medication prescribed by Dr. Tiburcio was not helping; Dr. Hayden increased her dosage of Seroquel and Trazodone and recommended psychotherapy. (R. 168, 177).

Plaintiff's response to medication varied over the following weeks. For example, on August 5, 2008, Plaintiff reported to Dr. Hayden that she was much better, despite continued signs of depression and difficulty falling asleep, and that she wanted to remain on her current medication. (R. 167). However, on August 19, 2008, she told Dr. Tiburcio that she wanted her medication adjusted because she was still "feeling sad and depressed all the time" and had difficulty sleeping. (R. 165). At her next appointment with Dr. Tiburcio on September 15, 2008, Plaintiff reported feeling much better but that she had started using heroin. (R. 163). By the time of her next appointment with Dr. Hayden on September 22, 2008, Plaintiff had been in and out of the heroin detox program at Bronx-Lebanon. (R. 156-57, 186). Plaintiff presented as very apologetic, ashamed and disappointed by her three-week heroin use, and Dr. Hayden noted that she "swears she'll never do it again." (R. 156-57, 186). Dr. Hayden observed that Plaintiff "will smile a little" but that she was "downcast today," and assessed her as suffering from "severe anxiety" and a history of depression. (R. 186). Plaintiff was taking Suboxone to assist with her

opiate withdrawal. (R. 156). On October 6, 2008, Dr. Hayden noted that Plaintiff was increasingly anxious and depressed. (R. 154).

Plaintiff also saw Dr. Cozort on October 6, 2008. (172-73). Dr. Cozort noted that Plaintiff's symptoms had worsened over the previous few months, and that she had feelings of hopelessness and suffered from insomnia and anhedonia. (R. 172). Upon mental status examination, Dr. Cozort found that Plaintiff had poor eye contact, depressed mood and labile affect. (R. 173). However, she found that her insight and judgment were intact and that Plaintiff was cooperative. (R. 173). Dr. Cozort recommended psychotherapy, continuing with Seroquel and Trazodone, and adding Celexa to Plaintiff's medications. (R. 173). At an appointment with Dr. Hayden on November 3, 2008, he indicated that Plaintiff would attend weekly appointments with Dr. Cozort for psychotherapy. (R. 190). Dr. Hayden also indicated that he would have bi-weekly sessions with Plaintiff for medication management. (R. 190). However, the record only contains two subsequent treatment notes from Dr. Cozort. (R. 148, 150).

Plaintiff's mental health continued to fluctuate. On October 14, 2008, Dr. Hayden noted that she was "a little calmer" and "less depressed," and that she was having a "good response" to the medications, including Celexa and Suboxone. (R. 152). Approximately one month later, at an appointment on November 17, 2008, Dr. Hayden described Plaintiff as "very angry." (R. 149). Upon mental status examination, he noted that Plaintiff had lost thirty-seven pounds and described her as "anxious, fearful when talking, worried about what others think of her, ashamed [and] tormented." (R. 192).

Dr. Hayden saw Plaintiff on January 25, 2009, and noted that she had been "avoiding coming into the clinic," because she had resumed using heroin, approximately one bag per day

intranasally, and felt "ashamed."[5] (R. 138). She reported that the Suboxone had been insufficient to help with her withdrawal symptoms, and that she had disclosed this to Dr. Cozort, whom she had seen for several sessions of psychotherapy, but that she had not "gotten up the courage" to tell Dr. Hayden.[6] (R. 138). She had run out of Suboxone approximately two months earlier, and had recently run out of Celexa and Seroquel, and requested renewal of her prescriptions and help with her opiate addiction. (R. 138). She continued to complain of "severe depression and anxiety symptoms." (R. 138). In his notes, Dr. Hayden observed that Plaintiff had a "severe lifelong anxiety disorder and also severe trauma having lost her young daughter to a fire . . . many years ago," and described her as having "multiple psychiatric disorders." (R. 138). Upon mental status examination, he found that she was alert and oriented "x3," with a bright affect but a depressed and anxious mood. (R. 138). He assessed her insight, judgment and impulse control as fair. (R. 138). He diagnosed her with opiate dependence, post-traumatic stress disorder ("PTSD"), panic disorder with agoraphobia and recurrent major depressive disorder. (R. 138). He noted that she had "too much substance abuse" to be treated in a psychiatric outpatient program, but "too many psychiatric symptoms" to be treated in a chemical dependency outpatient program. (R. 138). He also mentioned increasing psychotherapy, and suggested that she be evaluated by Mr. Bosch.[7] (R. 138).

By February 6, 2009, Plaintiff's medication regimen included: (i) Celexa, 40 mg per day; (ii) Seroquel XR, 400 mg per day; (iii) Trazodone, 100 mg at bedtime; and (iv) Suboxone, 8mg

---

[5] There are no treatment notes from Dr. Hayden from November 17, 2008, (R. 149, 192), until January 23, 2009, (R. 147) in the record.

[6] There are treatment notes from Dr. Cozort in the record from November 17, 2008, (R. 150), and November 24, 2008 (R. 148), but the treatment notes do not reflect that Plaintiff had resumed using heroin.

[7] The second and final page of this treatment note is missing from the record.

twice daily. (R. 210). She continued to have stress at home related to her teenage daughter and

her young grandson, and Dr. Hayden noted that she was "stabilizing her mental and substance

abuse conditions at the same time that her daughter appears to be decompensating." (R. 210).

Dr. Hayden performed a mental status examination, and found that Plaintiff's insight, judgment

and impulse control were fair, and that her mood and affect were anxious. (R. 210). Plaintiff

continued to see Drs. Hayden and Tiburcio through March 2009. (R. 139, 143, 144).

After March 30, 2009, the record contains a six-month gap in treatment notes, which do

not resume until September 22, 2009. There are two treatment notes from Dr. Hayden in the fall

of 2009, which seem to reflect that Plaintiff's mental health was improving. (R. 454-56). On

September 22, 2009, Dr. Hayden reported that Plaintiff was seen briefly on September 16, 2009

for medication renewals, and that at that time she reported that Xanax XR 1mg was "working too

slowly," so her medication had been increased.[8] (R. 454). Plaintiff reported on September 22

that "it ha[d] actually been helping with her anxiety," so her Xanax XR prescription was

increased to 2mg. (R. 454). She further reported that her "psychological situation [was]

stabilized." (R. 454). Dr. Hayden observed that she was "stabilized well on Suboxone and [was]

compliant," and noted that her "family turmoil . . . is diffused." (R. 454). Indeed, Plaintiff

reported that it was "very nice to have her mother in her home." (R. 454). Although she

complained of frequent panic attacks, she described the intensity of the attacks as diminished. (R.

454). Upon mental status examination, Dr. Hayden noted that Plaintiff's insight and judgment

were "fairly good," and that her impulse control was good at that time. (R. 454). He observed

that she "seem[ed] to be improving in her health and moving forward on her goals." (R. 454).

Dr. Hayden saw Plaintiff again on October 16, 2009. (R. 456). Plaintiff reported that she was

---

[8] There is no record of this appointment.

"doing well." (R. 456). Dr. Hayden noted that Plaintiff had "recently stabilized from many years of anxiety and depression, resulting [in] sporadic substance abuse." (R. 456). He performed a mental status examination, and noted that Plaintiff was "very enthusiastic with a wide smile, covering up some baseline anxiety." (R. 456). He found that she was alert and oriented "x3," and that her insight, judgment and impulse control were adequate. (R. 456). Dr. Hayden renewed Plaintiff's "rather complex psychiatric medication regimen," which included Celexa, Seroquel, Suboxone, Trazodone, Mirtazapine and Xanax, noting that she had "done well on this combination." (R. 456).

The record contains a second, significantly longer gap in treatment notes after October 16, 2009. The next treatment notes are from April 29, 2011, approximately eighteen months later.[9] From April 2011 through July 2011, Plaintiff continued to see Dr. Hayden. On April 29, 2011, Dr. Hayden noted that Plaintiff felt "some increased cyclical anxiety" and felt that she needed Xanax daily rather than every other day. (R. 458). Upon mental status examination, he found that she was chronically tremulous, that her affect and mood were anxious, her insight and judgment were "fair to fair plus," and her impulse control was good. (R. 459). On May 13, 2011, Dr. Hayden noted that Plaintiff had accepted a job passing out Western Union flyers on her way to the appointment, "to have something to do." (R. 461). Dr. Hayden and Plaintiff planned to reduce her Xanax dosage. (R. 462). At her next appointment, on June 17, 2011, Plaintiff reported that she had been out of her medication for three days and stated that she "fe[lt] it," especially the Seroquel. (R. 464). Although Plaintiff presented as "very nervous," she was otherwise doing well and Dr. Hayden assessed her as stable. (R. 464-65). Plaintiff had additional appointments with Dr. Hayden on July 1 and July 8, 2011, at which she presented as stressed,

---

[9] Notably, there are no treatment notes from MLK Health Center that reflect Plaintiff's suicide attempt and subsequent hospitalization at Bronx-Lebanon from March 1 through March 4, 2011. *See supra* Section I(A)(1).

and complained of family turmoil. (R. 467-68). On July 11, 2011, Plaintiff told Dr. Hayden that she felt "a little better" and "a little less anxious," and that it helped her to attend her appointment. (R. 469). At that point, she was on the following medications: (i) Alprazolam; (ii) Trazodone; (iii) Mirtazapine; (iv) Celexa; (v) Suboxone; and (vi) Seroquel XR. (R. 469).

Finally, there is a third gap in the record of approximately ten months, from July 2011 to May 2012. When the treatment notes resume in May 2012, it appears that Plaintiff had switched from Drs. Hayden and Tiburcio to Drs. Leggett and Barakat. From May 2012 through May 2013, Plaintiff saw Dr. Leggett at least three times, (R. 471, 481-82, 498), and Dr. Barakat at least five times, (R. 474-80, 483-62, 494-97, 504-07). She also had at least two appointments with Mr. Bosch. (R. 472-73, 492-93).

It appears that Plaintiff's first appointment with Dr. Leggett was on May 19, 2012, during which he managed her medications. (R. 471). He noted that she had been followed by "Dr. Hayden et al," that her last psychiatric appointment had been in February 2012, that she had intermittently been prescribed Xanax, and that she agreed to discontinue Xanax and switch to Perphenazine 4mg, as-needed for "breakthrough anxiety." (R. 471). Plaintiff was taking the following medications at that time: (i) Nicotine; (ii) Suboxone; (iii) Trazodone; (iv) Celexa; (v) Seroquel XR; and (vi) Mirtazapine. (R. 471). She was instructed to return in three months. (R. 471). At an appointment with her social worker, Mr. Bosch, three days later, Plaintiff described her depression and had a "sense of hopelessness when discussing her daughter." (R. 472). She appeared alert and oriented "x3" and had fair insight, judgment and impulse control, as well as good eye contact. (R. 472). However, she suffered from poor sleep as well as lapses in concentration and memory. (R. 472). She denied visual and auditory hallucinations. (R. 472). She saw Dr. Leggett again on December 18, 2012. (R. 481-82). Plaintiff had been out of

medication for one month but had remained stable. (R. 481). She saw Mr. Bosch again on January 31, 2013. (R. 492-93). He observed that she was poorly dressed and groomed, had poor eye contract, that her speech was slow and deliberate, and that she suffered from poor concentration and increased trouble sleeping, which she would discuss with Dr. Leggett. (R. 492-93). She stated that she disliked being "around people," and Mr. Bosch observed that she had "very little insight into her problems." (R. 492). Finally, Plaintiff had another appointment with Dr. Leggett on April 9, 2013. (R. 498). He noted that she had remained stable and was managing adequately. (R. 498). He found her alert and oriented "x3," calm, cooperative and conversational, and found her mood neutral and her affect congruent. (R. 498). He instructed Plaintiff to continue taking Seroquel XR, Celexa, Remeron and Trazodone; Plaintiff was also still taking Suboxone. (R. 498).

Plaintiff saw Dr. Barakat for Suboxone maintenance treatment on August 27, 2012. (R. 477-80). She answered "no" when asked whether she had "often been bothered by feeling down, depressed or hopeless" over the past month, but "yes" when asked whether she had "often been bothered by having little interest or pleasure in doing things" over the past month. (R. 477). Dr. Barakat refilled her Suboxone prescription and provided a follow-up psychiatry referral, and also advised Plaintiff to continue outpatient counseling and relapse precautions. (R. 479). On January 28, 2013, Plaintiff saw Dr. Barakat again for Suboxone maintenance treatment. (R. 487-90). She replied "no" when asked whether she had "often been bothered by having little interest or pleasure in doing things" over the past month, but "yes" when asked whether she had "often been bothered by feeling down, depressed or hopeless" over the past month. (R. 487). Plaintiff continued to see Dr. Barakat for Suboxone maintenance treatment on March 28, 2013, (R. 494-97), and May 10, 2013, (R. 504-07). In March, she replied "yes" to both questions regarding

symptoms of depression over the past month, (R. 494), and in May, she answered "no" to both questions, (R. 504). At both appointments, Dr. Barakat indicated that she should follow up with psychiatry as well as continue outpatient counseling and relapse precautions. (R. 496, 506).

There is opinion evidence from Drs. Hayden and Leggett. Dr. Hayden provided five separate opinions. The first is undated. (R. 205-06). Dr. Hayden completed a Treating Physician's Wellness Plan Report for the New York City Department of Social Service's public assistance program. (R. 205-06). He diagnosed Plaintiff with major depressive disorder, anxiety and panic attacks. (R. 205). Under the section for relevant clinical findings, he identified severe anxiety and panic, as well as depression with fearfulness and fatigue. (R. 205). He noted that Seroquel had been "partially helpful" to Plaintiff and that she had a "good response" to Celexa, which had been increased that day. (R. 205). He checked boxes to indicate that Plaintiff's condition had not resolved or stabilized and that she was temporarily unemployable, and opined that she needed at least three months until she would stabilize. (R. 206). Dr. Hayden filled out a second Treating Physician's Wellness Plan Report on February 23, 2009. (R. 207-08). In addition to depression, anxiety and panic attacks, he diagnosed Plaintiff with paranoia, opioid dependence and mood disorder not otherwise specified. (R. 207). Regarding relevant clinical findings, Dr. Hayden again noted that she had severe anxiety, and identified family issues. (R. 207). He further noted that Suboxone and Trazodone had been added to her medication, and that she was referred to "social services in wellness (Mr. Bosch)." (R. 207). He again checked a box to indicate that her condition had not resolved or stabilized, and this time estimated that she needed six to twelve months to stabilize. (R. 208). He also checked a box to indicate that she was unable to work for at least twelve months. (R. 208). On May 4, 2009, Dr. Hayden sent a letter to "Social Security/Disability Representative" to request assistance in appealing Plaintiff's

request for SSI. (R. 243). He identified himself as Plaintiff's treating psychiatrist, and noted that he had followed her for the past nine months. (R. 243). He wrote that, in his opinion, "her psychiatric conditions, including Major Depressive Disorder, Posttraumatic Stress Disorder, and Panic Disorder with Agoraphobia, are so severe and treatment resistant that she is unable to be gainfully employed." (R. 243).

Next, on August 2, 2010, Dr. Hayden wrote a letter to the Appeals Council in response to the first ALJ's denial of Plaintiff's claim. (R. 286). The first ALJ had requested information from Dr. Hayden, (R. 56), but the ALJ's decision noted that "Dr. Hayden failed to provide specific functional limitations," that his "reports have been inconsistent and have contradicted each other," and that "he did not respond" to the ALJ's request, (R. 15). In response, Dr. Hayden noted that he continued to treat Plaintiff. (R. 286). He first addressed the inconsistency between his Treating Physician's Wellness Plan Reports regarding the time he estimated it would take for Plaintiff to stabilize. (R.286). In the first, which he "inadvertently failed to date," he explained that it was an "early report," and that he completed it "before [he] had a deeper knowledge of [Plaintiff's] problems." (R. 286). He explained that the "inconsistency is attributable to increase[d] knowledge of the [Plaintiff] leading to a different estimate of the time needed for recovery." (R. 286). He next addressed the lack of documentation regarding Plaintiff's functional impairments, and wrote that the focus of his treatment was on symptom reduction. (R. 286). He concluded by observing that Plaintiff never travelled to the clinic alone, and that she was "deathly afraid of having a panic attack in public." (R. 286). In his opinion, taking into consideration Plaintiff's "severe anxiety impairment," he believed she suffered from a "chronic mental condition that causes marked impairment in social functioning." (R. 286).

Finally, on January 14, 2011, Dr. Hayden completed a third Treating Physician's Wellness Plan Report. (R. 280-81). He diagnosed her with panic attacks and depression. (R. 280). In the section for relevant clinical findings, Dr. Hayden noted, *inter alia*, that she had PTSD, recurrent major depression, anxiety and agoraphobia with panic disorder, that she felt nervous, and that she had been "crying on and off" for four months. (R. 280). He checked boxes to indicate that she was compliant in attending scheduled appointments and taking prescription medication. (R. 280). He listed the following medications that Plaintiff was prescribed: (i) Celexa; (ii) Mirtazapine; (iii) Seroquel; (iv) Trazodone; (v) Alprazolam; and (vi) Suboxone. (R. 280). He also checked boxes to indicate that Plaintiff had not stabilized from her condition and that she was unable to work for at least twelve months. (R. 281). He noted that she continued to complain of feeling depressed and suffered from panic attacks and nervousness. (R. 281).

Dr. Leggett completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental) on April 9, 2013. (R. 451-53). In terms of Plaintiff's ability to understand, remember and carry out short, simple instructions, Dr. Leggett checked boxes indicating that Plaintiff was moderately impaired. (R. 451). He further indicated that she was: (i) markedly impaired in her ability to make judgments on simple work-related decisions; (ii) markedly to extremely impaired in her ability to understand and remember detailed instructions; and (iii) extremely impaired in her ability to make judgments on simple work-related decisions. (R. 451). In making the above assessments, he noted her history of learning disabilities and special education. (R. 451). Regarding Plaintiff's ability to respond appropriately to supervision, co-workers and work pressures in a work setting, Dr. Leggett indicated that Plaintiff was moderately impaired in her abilities to interact appropriately with the public and with co-workers, and markedly impaired in her abilities to: (i) interact appropriately with supervisors; (ii) respond

appropriately to work pressures in a usual work setting; and (iii) respond appropriately to changes in a routine work setting. (R. 452). He again noted her history of learning disabilities, and concluded that she could not "hold a job." (R. 452).

### 3. Federation Employment and Guidance Services

There are two evaluations in the record from Federation Employment and Guidance Services ("FEGS"). (R. 112-36, 245-79). Plaintiff's first FEGS evaluation spanned from August to September 2008. (R. 112-36). Plaintiff complained of depression and panic attacks, and reported taking Seroquel and Trazadone. (R. 112-13, 129). Upon medical examination, FEGS Dr. Cindy Grubin noted that Plaintiff's neurological/psychiatric state was dysthymic. (R. 115). Plaintiff was referred by Dr. Grubin to FEGS Dr. Jorge Kirschtein for a mental status examination. (R. 116-23). Dr. Kirschtein found that her appearance was neat, her manner was cooperative, her thought processes were normal and logical, and that she spoke with a normal cadence. (R. 118). He also found that she was restless and that her mood was depressed. (R. 118). In terms of functional impairments, Dr. Kirschtein found that Plaintiff was moderately impaired in her abilities to: (i) follow work rules; (ii) accept supervision; (iii) deal with the public; (iv) maintain attention; (v) relate to co-workers; and (vi) adapt to change. (R. 119). He found that she was severely impaired in her ability to adapt to stressful situations. (R. 119). Dr. Kirschtein diagnosed Plaintiff with cyclothymia, panic disorder without agoraphobia, PTSD and attention-deficit/hyperactivity disorder, and noted a possible learning disorder with severe vocational impairments. (R. 120-21). He recommended weekly psychotherapy, monthly medication management, and adding a mood stabilizer or selective serotonin reuptake inhibitor. (R. 121-22).

As part of the first evaluation, Plaintiff was also seen by social worker Netanya Bell, who completed a biopsychosocial summary. (R. 124-136). Based on a questionnaire, Plaintiff reported to Ms. Bell that, at the time of the evaluation, for several days during the preceding two weeks she: (i) felt down, depressed or hopeless; (ii) felt bad about herself or that she was a failure or had let herself or her family down; and (iii) had trouble concentrating. (R. 129). She denied other symptoms. (R. 129). Plaintiff told Ms. Bell that she could travel independently by bus or train, had walked to the appointment by herself, and did not have travel limitations or special transportation needs, although noted that she suffered from panic attacks. (R. 130). Regarding her activities of daily living, Plaintiff claimed she was able to do the following: (i) wash dishes; (ii) wash clothes; (iii) sweep or mop the floor; (iv) vacuum; (v) watch television; (vi) make beds; (vii) shop for groceries; (viii) cook meals; (ix) read; (x) socialize; (xi) get dressed; (xii) bathe; (xiii) use the toilet; and (xiv) groom herself. (R. 130). She reported that she had no hobbies, and no contact with friends and family. (R. 130-31). The conclusion of the exam was that Plaintiff's mental health temporarily prohibited employment. (R. 136).

Plaintiff's second FEGS evaluation was in November 2010. (R. 245-79). On November 16, 2010, she underwent a physical examination by FEGS Dr. Padmavathi Jagarlamundi, who referred her to Dr. Eliseo Go for a psychiatric evaluation. (R. 267-79; *see also* R. 245). Dr. Jagarlamundi noted that Plaintiff complained of feeling depressed, passive suicide ideations, auditory hallucinations, and insomnia and memory problems. (R. 269-71). Dr. Go completed a psychiatric evaluation on November 24, 2010. (R. 245-51). Dr. Go checked boxes corresponding to the following mental symptoms and complaints that Plaintiff claimed to have had over the preceding month: panic, anxiety/fearfulness, depressed mood, loss of appetite, poor concentration, fear of going outside, insomnia and loss of interest in sex. (R. 245-46). Upon

mental status examination, Dr. Go found that Plaintiff appeared well-groomed, her manner was cooperative, she spoke with a normal cadence, her activity was calm, her affects were within a normal range, her form of thought was logical and she had no suicidal or homicidal thoughts. (R. 246-47). However, her mood was depressed and she had psychosomatic preoccupations/fears. (R. 247). In terms of functional impairments, Dr. Go found that Plaintiff was not impaired in her abilities to: (i) follow work rules; (ii) relate to co-workers; (iii) accept supervision; and (iv) deal with the public. (R. 247-48). The doctor found she was mildly impaired in her abilities to maintain attention and adapt to change, and moderately impaired in her ability to adapt to stressful situations. (R. 248). He commented that she was "still not stabilized" and "ha[d] [an] ongoing substance abuse problem," and concluded that she was temporarily disabled from work, for a likely period of three months. (R. 249).

She was also seen by FEGS social worker Bessie Woodward-Slater, who completed a biopsychosocial summary on November 16, 2010. (R. 252-65). Plaintiff walked to the appointment and explained that, because of panic attacks, she was unable to use public transportation or travel alone, and needed an escort to her appointments. (R. 263). Ms. Woodward-Slater suggested that Plaintiff may benefit from a paratransit service. (R. 263). In terms of employability, Plaintiff reported that she was unable to work because of her mental health problems, and that although she had recently worked as a babysitter, she had lost that job when the parents of the children "saw all the pills she was taking." (R. 259, 264). Ms. Woodward-Slater found that Plaintiff was not interested in working. (R. 259).

Regarding her mental health, Plaintiff indicated that she had received treatment for over twenty-four months for panic attacks and depression, and reported monthly treatment with her psychiatrist, Dr. Hayden. (R. 261-62). She described to Ms. Woodward-Slater a history of

punching herself when she felt angry, in attempt to release pressure, and reported that the behavior left red marks. (R. 262). Plaintiff said that the behavior had started two months earlier, and that she had not spoken with her psychiatrist about it. (R. 262). She said that the last incident of punching herself had been one month prior, but that she "felt like punching herself [two] days ago when she was angry after cutting herself cooking." (R. 262). She also reported daily auditory hallucinations, which she described as hearing her voice called when no one was there, and noted that it happened as recently as that morning. (R. 262-63).

Turning to symptoms that Plaintiff had experienced over the preceding two weeks, she reported that the following occurred nearly every day: (i) feeling down, depressed or hopeless; (ii) trouble falling or staying asleep, or sleeping too much; and (iii) feeling tired or having little energy. (R. 262). On more than half of the days over the prior two weeks, Plaintiff had little interest or pleasure in doing things and poor appetite or overeating. (R. 262). She reported that on several days, she: (i) felt bad about herself, or that she was a failure or had let herself or her family down; (ii) had trouble concentrating on things; and (iii) thought that she would be better off dead or hurting herself in some way. (R. 262). Plaintiff indicated that the above symptoms had made it somewhat difficult for her to take care of things at home or get along with other people. (R. 262). In terms of her daily life, Plaintiff stated that she spent her day looking after her grandson and children, cooking, cleaning, doing laundry and watching television. (R. 263). Ms. Woodward-Slater noted that she did all daily living activities except for socialize.[10] (R. 263). Plaintiff also informed the social worker that she had a history of heroin use, but had not used for

---

[10] Specifically, Plaintiff indicated that she could do the following: (i) wash dishes; (ii) wash clothes; (iii) sweep/mop the floor; (iv) vacuum; (v) watch television; (vi) make beds; (vii) shop for groceries; (viii) cook meals; (ix) read; (x) get dressed; (xi) bathe; (xii) use the toilet; and (xiii) groom herself. (R. 264).

over twenty-four months. (R. 260). She indicated that she continued to take Suboxone. (R. 261). Ms. Woodward-Slater assessed Plaintiff's depression as severe. (R. 262).

## B. Non-Medical Evidence

Plaintiff completed an adult function report on March 27, 2009. (R. 94-102). In it, she indicated that her daily activities included watching television, walking around the house, cooking, cleaning and taking care of her children and grandson, and that she could also do laundry. (R. 94-95, 97-98). She reported that her children and her mother sometimes helped her with these tasks. (R. 95, 97). Regarding her children and grandson, she noted that she bathed, fed and played with her grandson, and that she talked to her children. (R. 95, 99). She also spoke to her sister and brother on the phone. (R. 99).

In terms of how her activities had changed since the alleged onset date, she wrote that she could no longer "keep still," explaining that "now I can't because I move all over the place and sometimes I think to[o] much." (R. 95). She described the effects and symptoms of her alleged impairment as follows: (i) she could not hear too much noise; (ii) sometimes she did not "feel like taking [her] bath;" (iii) sometimes she did not "feel like combing [her] hair;" and (iv) that although she fed herself and prepared meals daily, spending forty-five minutes to one hour cooking hamburgers or hot dogs, "sometimes" she did not "feel hungry." (R. 95-96). Plaintiff noted that her children and mother reminded her to take her medication, and that sometimes her mother or daughter helped prepare meals. (R. 96). She also observed that since her alleged onset date, her cooking habits had become "much faster." (R. 96). She claimed to go outside every five to ten days, and explained that she did not go outside more often either because she did not "feel like it" or was too scared, and that she did not go outside alone because she felt that everybody looked at her. (R. 97). That said, physically, Plaintiff indicated that she could "walk a

-20-

lot" before she had to stop and rest, and that she did not require much rest before she could continue walking. (R. 100). Plaintiff reported shopping for food or clothes every fifteen days, and that she could pay bills, count change, handle a savings account and use a checkbook. (R. 98). Plaintiff further noted that she sometimes had problems paying attention because she "had other things on [her] mind," and that she had trouble remembering things. (R. 100-01). However, she stated that she could finish what she started, could follow spoken and written instructions, and had no problems getting along with bosses or other people. (R. 100-01).

## C. Consulting Physicians

The administrative record contains evaluations by two psychiatric consulting physicians.

## 1. Herb Meadow, M.D.

Dr. Meadow completed a psychiatric evaluation of Plaintiff on April 9, 2009.[11] He noted that she was driven to the appointment by a friend, and that she "avoid[ed] public transportation because of panic attacks." (R. 216). He indicated that Plaintiff had no work history, but that she had completed 11th grade in a special education program and could read. (R. 216). Dr. Meadow reviewed Plaintiff's psychiatric and medical histories and noted that she had not been hospitalized. (R. 216). She had, however, received psychiatric treatment over the previous year for depression and anxiety, and was being treated by Dr. Hayden once monthly, and by a therapist once weekly. (R. 216). She was taking the following medication: Trazodone, Seroquel, Suboxone and Citalopram. (R. 216). As for drugs and alcohol, Dr. Meadow noted that she had a history of heroin-use, but had been substance-free for four months. (R. 217).

---

[11] The Commissioner informed the Court in her Memorandum of Law in Support of her Motion that Dr. Meadow pled guilty in Kings County Supreme Court to attempted enterprise corruption and health care fraud on November 5, 2015. (Docket No. 14 at 14, 31-34).

Regarding symptoms, Plaintiff told Dr. Meadow that she had difficulty falling asleep, that her appetite was poor and her weight fluctuated, and that she experienced crying spells, irritability, low energy, diminished self-esteem and difficulty concentrating. (R. 216). Dr. Meadow characterized these as symptoms of depression and dysphoric moods. (R. 216). Plaintiff described her panic attacks as occurring with varied frequency, as manifesting as "trembling with palpitations," and as being triggered by loud noises, crowds and feeling frightened. (R. 216). She denied agoraphobia, suicidal thoughts, manic symptoms, thought disorder and cognitive deficits. (R. 216). Turning to her mode of living, Plaintiff reported socializing primarily with her immediate family. (R. 218). She was able to take care of her personal hygiene and complete all household chores, and spent her days watching television, reading and listening to music. (R. 218).

Upon examination, Dr. Meadow observed that Plaintiff's demeanor was cooperative, her manner of relating was adequate, and she was well groomed and dressed appropriately. (R. 217). While her gait and posture were normal and her eye contact was appropriate, she was restless, had trouble sitting still, and had a gross tremor of both hands. (R. 217). He found that her thought processes were coherent and goal-directed, her attention and concentration as well as her recent and remote memory skills were intact, her cognitive functioning was average, and her insight and judgment were fair. (R. 217-18). Dr. Meadow further found that Plaintiff's affect was appropriate in speech and thought content, but her mood was depressed. (R. 217). He concluded that although the results of the examination appeared consistent with psychiatric problems, her problems did not interfere with Plaintiff's ability to function on a daily basis, and that, in his opinion, Plaintiff would be able to perform all tasks necessary for vocational functioning. (R. 218). Finally, Dr. Meadow diagnosed Plaintiff with depressive disorder,

generalized anxiety disorder, panic disorder without agoraphobia and heroin abuse/dependence, in partial remission. (R. 218). He found her prognosis was fair and recommended that she continue with psychiatric treatment. (R. 218).

## 2. Arlene Broska, Ph.D.

Approximately four years after Dr. Meadow's evaluation, on January 17, 2013, Dr. Broska completed a psychiatric evaluation of Plaintiff. (R. 442). Dr. Broska noted that Plaintiff walked to the appointment by herself. (R. 442). She indicated that Plaintiff was not employed, and that she had last worked three years prior, as a babysitter for two weeks. (R. 442). Plaintiff claimed she was unable to work because her "medication made her too drowsy." (R. 442). Regarding Plaintiff's psychiatric history, Dr. Broska reported that Plaintiff had been treated at Bronx-Lebanon in 2011 or 2012 for an attempted overdose. (R. 422). At the time of the evaluation, Plaintiff was seen by Dr. Leggett every two to three months. (R. 442). She also reported seeing Mr. Bosch every one to two weeks. (R. 442). Dr. Broska noted that Plaintiff had been in psychiatric treatment for approximately three years. (R. 442). She also reviewed Plaintiff's medical history; Plaintiff did not report any medical hospitalizations or conditions. (R. 442). She listed her medication as Mirtazapine, Trazodone, Seroquel, Celexa, calcium/vitamin D and a multivitamin. (R. 442).

Dr. Broska reviewed Plaintiff's symptoms. (R. 442-43). Plaintiff reported that her medication helped her to sleep, and that her appetite varied. (R. 442). In the course of a typical week, she stated that her mood was "in the middle" for at least three days; other days, Plaintiff felt "either up or down." (R. 442). She described "down days" as sleeping a lot, feeling like she did not want to do anything, or being irritable. (R. 442). At times, she felt severely depressed and would not want to get dressed, shower or comb her hair. (R. 442). She described her "up

days" as more frequent than her "down days," and described being talkative, having a lot of energy, being easily distracted, having a racing mind, being forgetful, and "speed[ing]." (R. 443). At times, she got very angry and would express her anger by, for example, hitting the dresser. (R. 443). Plaintiff described getting anxious, particularly on public transportation or when she felt "closed in," and expressed a desire to "run[] away" when that happened. (R. 443). Plaintiff reported one suicide attempt in 2011 or 2012, but denied any suicidal or homicidal ideation, intent or plans at the time of the evaluation. (R. 442-43). Dr. Broska reviewed Plaintiff's mode of living, indicating that Plaintiff was able to bathe, dress and groom herself daily. (R. 444). Plaintiff reported cooking, cleaning and doing laundry once a week, but noted that she did not shop often. (R. 444). She spent time watching television and listening to the radio. (R. 444).

Upon examination, Dr. Broska found that Plaintiff's demeanor and responsiveness to questions were cooperative, and that her manner of relating, social skills and overall presentation were adequate. (R. 443). She observed that her grooming was fair, her posture and motor behavior were normal, and her eye contact was appropriate. (R. 443). She described Plaintiff's mood as neutral and her thought processes as coherent and goal-directed, but noted that her affect was anxious. (R. 443). While her attention and concentration were intact and her insight and judgment were fair, Dr. Broska indicated that Plaintiff's recent and remote memory skills were mildly impaired, and her intellectual functioning was below average. (R. 444). Dr. Broska concluded that, vocationally, it appeared Plaintiff could perform the following tasks: (i) follow and understand simple directions and instructions; (ii) perform simple tasks independently; (iii) maintain attention and concentration; (iv) perform complex tasks independently; and (v) make some appropriate decisions. (R. 444). She opined that "there may be times [Plaintiff] has difficulty relating adequately with others and appropriately dealing with stress." (R. 444). Dr.

Broska noted that although the results of the examination appeared consistent with psychiatric problems, the problems were not significant enough to interfere with Plaintiff's ability to function on a daily basis. (R. 444). Finally, she diagnosed Plaintiff with bipolar disorder and anxiety disorder and recommended that she continue with mental health treatment. (R. 445). Her prognosis was fair. (R. 445).

Dr. Broska also completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental) dated January 30, 2013. (R. 446-48). Dr. Broska indicated that Plaintiff's ability to understand, remember and carry out instructions, as well as her ability to interact appropriately with supervisors, co-workers and the public, and her ability to respond to changes in the routine work setting, were affected by her impairment. (R. 446-47). She checked boxes to specify that Plaintiff was mildly impaired in her abilities to: (i) understand and remember simple instructions; (ii) carry out simple instructions; and (iii) make judgments on simple work-related decisions. (R. 446). She also found that Plaintiff was moderately impaired in her abilities to: (i) understand and remember complex instructions; (ii) carry out complex instructions; (ii) make judgments on complex work-related decisions; (iv) interact appropriately with the public; (v) interact appropriately with supervisor(s); (vi) interact appropriately with co-workers; and (vii) respond appropriately to usual work situations and to changes in a routine work setting. (R. 446-47). Dr. Broska concluded that "mood and anxiety symptoms may impact [Plaintiff's] interpersonal interactions in a vocational setting." (R. 447).

**D. Residual Functional Capacity Assessment**

The state agency consultant, E. Kamin, Ph.D., completed a mental residual functional capacity ("RFC") assessment on April 16, 2009, by checking boxes on a form. (R. 234-36). Dr. Kamin found that Plaintiff was not significantly limited in her abilities related to understanding

and memory. (R. 234). She was moderately limited in the following abilities related to sustained concentration and persistence: (i) her ability to work in coordination with or proximity to others without being distracted by them; (ii) her ability to make simple work-related decisions; and (iii) her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 234-35). In terms of social interaction, Dr. Kamin indicated that Plaintiff was moderately limited in her abilities to interact appropriately with the general public and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (R. 235). Finally, regarding Plaintiff's capacity for adaptation, Dr. Kamin concluded that she was moderately limited in her ability to travel in unfamiliar places or use public transportation, and in her ability to set realistic goals or make plans independently of others. (R. 235). In all other abilities listed on the form, Dr. Kamin noted that Plaintiff was not significantly limited. (R. 234-35).

**E. Testimony during June 7, 2013 Hearing before ALJ Barr**

Plaintiff testified by video teleconference at the June 7, 2013 hearing before ALJ Barr and was represented by an attorney. (R. 294, 306-23, 361). Upon questioning by her attorney,[12] Plaintiff reported that she lived with her son and daughter, both of whom were teenagers, and her grandson, who was four years old. (R. 312). She described spending her typical day cleaning and talking to her children, and stated that she did not "watch too much TV." (R. 312). Plaintiff said that she only left her home for appointments and to go grocery shopping, and that her daughter typically accompanied her on both types of outing. (R. 312-13). She did not take public transportation. (R. 312).

---

[12] Plaintiff's attorney, rather than the ALJ, conducted most of the questioning of Plaintiff at the hearing.

Regarding her mental impairment, Plaintiff testified that she believed she was unable to work because of panic attacks, which occurred "almost every day." (R. 311). She said that she suffered from panic attacks both when she was on and off of medication—specifically, Seroquel and Trazodone—and that the panic attacks occurred "basically anywhere."[13] (R. 311, 315). She described her symptoms as "get[ting] sweats," and feeling "nervous" and "uncomfortable." (R. 311). Plaintiff stated that she was receiving psychiatric treatment at the time of the hearing and described appointments with Dr. Leggett every three months. (R. 313-14). She also reported seeing a therapist, whom she referred to as "Ms. Marissa," every two weeks.[14] (R. 313-14). As for her history of substance abuse, Plaintiff testified, and her attorney confirmed, that she had not used since approximately 2010, at which point she experienced a brief relapse, and that she was clean in 2008, as of the filing date. (R. 310, 314, 316). Upon questioning by the ALJ, Plaintiff's attorney stated that the longevity of Plaintiff's treatment and the medication she was prescribed were evidence that she had been disabled since 2008. (R. 315-16).

A vocational expert, Joe Pearson, testified by phone. (R. 317-22). ALJ Barr asked him to consider the following hypothetical: an individual of the same age, education and work experience as Plaintiff, who did not have any exertional limitations, but was limited to simple, unskilled work, and would need a low-stress position, which she defined as only occasional changes in the work setting, occasional decision-making, and no assembly-line work. (R. 319). She further clarified that the hypothetical individual would be limited to a low-contact position, which she defined as only occasional interaction with coworkers, supervisors or the general public. (R. 319). The vocational expert concluded that the following three positions would be

---

[13] Upon questioning by the ALJ, Plaintiff described "get[ting] sleepy, tired" as a side effect of her medication. (R. 317).

[14] There is no evidence in the record reflecting bi-weekly appointments with a therapist named Marissa.

appropriate for such an individual, and existed in the regional and national economies: (i) mail

clerk, DOT 209.687-026; (ii) photocopy machine operator, DOT 207.685-014; and (iii)

housekeeping cleaner, DOT 323.687-014. (R. 319-20). Upon further questioning by the ALJ,

Mr. Pearson opined that: (i) the three positions he provided did not require direct contact with the

public; (ii) that if the hypothetical individual could not have any interaction with coworkers, the

position of mail clerk would not be appropriate, and the availability of jobs as a photocopy

machine operator or housekeeping attendant would decrease by 50%; (iii) that if the hypothetical

individual needed to be off task for at least 5% of the workday, the three positions would still be

appropriate; (iv) that if the time the hypothetical individual needed to be off task per day

increased to 10%, there would be an estimated 50% reduction of the number of jobs available for

each position, noting that at a 15% reduction, all jobs would likely be eliminated; and (v) that if

the hypothetical individual suffered from daily panic attacks and was unable to leave the home,

that individual would not be able to find work in the national economy. (R. 320-22).

**F. ALJ Barr's Decision**

ALJ Barr heard Plaintiff's case on remand from the Appeals Council. (R. 294). As will

be discussed in more detail *infra* Section II(F), the Appeals Council generally directed ALJ Barr

to: (i) evaluate Plaintiff's mental impairments in accordance with the special technique described

in 20 C.F.R. § 416.920a; (ii) give further consideration to Plaintiff's mental RFC; and (iii) obtain

evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's

occupational base, pursuant to Social Security Ruling 83-14. (R. 346-47; *see also* R. 294).

ALJ Barr applied the five-step approach in her November 14, 2013 decision. (R. 294-

301). At the first step, she found that Plaintiff had not engaged in "substantial gainful activity

since October 24, 2008, the application date." (R. 296). At the second step, the ALJ determined

that Plaintiff had the following severe impairments: depression disorder and anxiety disorder. (R. 296). At the third step, ALJ Barr held that Plaintiff did not have a medically determinable impairment or a combination of impairments that were listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 296). The ALJ considered Listings 12.04 and 12.06 for mental disorders and noted her consideration of the "paragraph B" criteria, finding that Plaintiff had mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace and no episodes of decompensation of extended duration.[15] (R. 296-97). Because Plaintiff's mental impairment did not cause at least two marked limitations, or one marked limitation and repeated episodes of decompensation, each of extended duration, the ALJ found the "paragraph B" criteria were not satisfied. (R. 297). ALJ Barr also found that the evidence failed to meet the "paragraph C" criteria. (R. 297).

The ALJ then determined that Plaintiff had the RFC to perform a full range of work at all exertional levels, subject to the following non-exertional limitations: (i) simple and unskilled tasks, involving only occasional interaction with co-workers and no interaction with the general public; and (ii) at low stress, defined as involving only occasional decision-making and occasional changes in the work setting, and no assembly line work. (R. 298). In determining Plaintiff's RFC, the ALJ specifically noted her consideration of "all symptoms and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as her consideration of opinion evidence. (R. 298).

Regarding non-medical evidence, the ALJ held that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. (R. 298). The ALJ discussed Plaintiff's hearing testimony, noting that she testified that she had

---

[15] The ALJ clarified that "[r]epeated episodes of decompensation, each of extended duration, means three episodes within [one] year, or an average of once every [four] months, each lasting for at least [two] weeks." (R. 297).

panic attacks on a regular basis, was consistently nervous, and mostly stayed at home because she felt uncomfortable around strangers, and that, despite medication, her condition limited her activities. (R. 298). The ALJ also reviewed Plaintiff's activities of daily living, as reported by Plaintiff on her adult function report, and found Plaintiff to be partially credible. (R. 299). She noted that Plaintiff was able to do chores around the home, such as cooking, cleaning and shopping. (R. 299). ALJ Barr further observed that although Plaintiff alleged that she was unable to concentrate, she indicated on the function report that she was able to perform household chores, interact with her family, shop, watch television and follow both written and spoken instructions, which required her to maintain concentration and attention. (R. 299).

ALJ Barr next reviewed the medical evidence in the record and discussed what weight she gave to the opinion evidence. (R. 298-300). She first reviewed reports from the two consultative examiners, Drs. Broska and Meadow, which contained similar findings. (R. 298-99). ALJ Barr gave significant weight to Dr. Broska's opinion because she examined Plaintiff in person. (R. 299). The ALJ noted that Dr. Broska found that Plaintiff could follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, perform complex tasks independently and make appropriate decisions. (R. 299). She further noted Dr. Broska's finding that, at times, Plaintiff may have difficulty relating adequately with others and dealing appropriately with stress. (R. 299). Finally, she noted Dr. Broska's conclusion that Plaintiff's psychiatric problems were not sufficiently significant to interfere with her ability to function on a daily basis. (R. 299).

ALJ Barr gave Dr. Meadow's 2009 opinion some weight, because he examined Plaintiff in person, and because his evaluation was consistent with the record and the evaluation by Dr. Broska. (R. 299). However, because Dr. Meadow's opinion was not as recent as Dr. Broska's,

the ALJ gave it less weight. (R. 299). She noted Dr. Meadow's opinion that Plaintiff was able to perform all tasks for vocational functioning, and that her psychiatric problems were not significant enough to interfere with her ability to function on a daily basis. (R. 299). The ALJ also gave some weight to the state agency mental health consultant, Dr. Kamin. (R. 299). She found that, although Dr. Kamin's analysis was also from 2009, the opinion was formed "with the benefit of having reviewed the evidence in [Plaintiff's] file." (R. 299). She noted Dr. Kamin's finding that Plaintiff had only mild or moderate limitations in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (R. 299).

Plaintiff's treating physicians' opinions were reviewed next. (R. 299-300). ALJ Barr gave some weight to the opinion of Dr. Leggett. (R. 299). She explained that, although he was Plaintiff's treating physician, his opinion was "inconsistent with the medical evidence as a whole and not supported by the record." (R. 299). As an example, she noted that while Dr. Leggett opined that Plaintiff had a marked restriction for interacting appropriately with supervisors, Plaintiff indicated that she had "no problems getting along with bosses, police, or other people in authority." (R. 299). The ALJ gave little weight to Dr. Hayden's opinion, acknowledging that he was Plaintiff's treating physician, but finding that his report "fail[ed] to offer any specificity" as to how Plaintiff's ability to perform work-related activities was restricted. (R. 299-300). She also found that Dr. Hayden's opinion was inconsistent with records submitted by Dr. Leggett, as well as the reports of the consultative examiners. (R. 300). Further, she viewed Dr. Hayden's opinion that Plaintiff was unable to work as "overbroad," and stated that it "fail[ed] to offer strong evidence" of Plaintiff's disability claim. (R. 300). Finally, she noted that a determination regarding whether an individual is disabled or unable to work under the Act is reserved to the Commissioner. (R. 300).

At the fourth step, the ALJ determined that Plaintiff had no past relevant work. (R. 300). She noted that Plaintiff was a younger individual on the date the application was filed and that she was able to communicate in English, but that she had a limited education. (R. 300). At the fifth step, ALJ Barr considered Plaintiff's age, education, work experience and RFC, and found that jobs exist in significant numbers in the national economy that Plaintiff could perform. (R. 300). In reaching this conclusion, the ALJ consulted a vocational expert. (R. 300-01). The vocational expert testified that an individual with Plaintiff's age, education, work experience and RFC would be able to perform the following representative jobs: (i) mail clerk; (ii) photo copying machine operator; and (iii) housekeeper/cleaner.[16] (R. 300-01). Based on the vocational expert's testimony, and considering Plaintiff's age, education, work experience and RFC, the ALJ determined that Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy, and was not disabled. (R. 301). She concluded that Plaintiff had not been under a disability, as defined in the Act, since October 24, 2008, the date the application was filed. (R. 301).

## II. DISCUSSION

The Commissioner argues that the ALJ's decision was supported by substantial evidence. (Docket No. 14). Although the Commissioner's Motion is unopposed, the Court must nevertheless review the record to determine whether there are sufficient grounds to grant the Motion. *Ortiz v. Commissioner of Social Security*, No. 15-CV-7602 (SN), 2017 WL 519260, at *5 (S.D.N.Y. Feb. 8, 2017) (citations omitted).[17] Moreover, because Plaintiff is proceeding *pro*

---

[16] The expert further testified that the jobs existed in the following numbers in the regional and national economies, respectively: (i) 7,170 and 115,010 positions; (ii) 4,660 and 66,280 positions; and (iii) 31,870 and 877,980 positions. (R. 300-01).

[17] In accordance with *Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009) and Local Civil Rule 7.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and any

*se*, she is "entitled to a liberal construction of [her] pleadings," and her complaint "should be read to raise the strongest arguments that [it] suggest[s]." *Id.* at *6 (citations and quotation marks omitted).

## A. Legal Standards

A claimant is disabled and entitled to disability benefits if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)). The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "'and bears the burden of proving his or her case at steps one through four.'" *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (citation omitted).

---

others cited herein, only available by electronic database, accompany this Report and Recommendation and shall be simultaneously delivered to the *pro se* Plaintiff.

## B. Standard of Review

When reviewing an appeal from a denial of Social Security benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (citations and quotation marks omitted); *see also* 42 U.S.C. § 405(g). The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (citations and quotation marks omitted). If the findings of the Commissioner are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The substantial evidence standard "is still a very deferential standard of review—even more so than the 'clearly erroneous' standard. The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (emphasis in the original) (quotation marks and citations omitted). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149 (citation omitted). Even if there is evidence on the other side, the Court defers "to the Commissioner's resolution of conflicting evidence." *Cage*, 692 F.3d at 122 (citation omitted).

However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of

the ALJ. Failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*,

377 F.3d 183, 189 (2d Cir. 2004) (citation and quotation marks omitted).

## C. Duty to Develop the Record

The ALJ has an affirmative obligation to develop the record due to the non-adversarial

nature of the administrative proceeding. *Burgess*, 537 F.3d at 128 (citations omitted). "The SSA

is required to make 'every reasonable effort' to obtain a claimant's treating physician's medical

reports. . . . This means that the ALJ should make an initial request from the claimant's treating

physician for records, plus one follow-up request." *Oliveras ex rel. Gonzalez v. Astrue*, No. 07

Civ. 2841 (RMB) (JCF), 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008), *report and*

*recommendation adopted*, 2008 WL 2540816 (S.D.N.Y. June 25, 2008) (citations omitted); *see*

*also* 20 C.F.R. §§ 404.1512(b)(1), 416.912(b)(1)). Thereafter, "if the documents received lack

any necessary information, the ALJ should recontact the treating physician." *Oliveras*, 2008 WL

2262618, at *6 (citations omitted). The ALJ must therefore seek additional evidence or

clarification where the documentation "from a claimant's treating physician, psychologist, or

other medical source is 'inadequate . . . to determine whether [the claimant] is disabled.'"

*Antoniou v. Astrue*, No. 10-CV-1234 (KAM), 2011 WL 4529657, at *13 (E.D.N.Y. Sept. 27,

2011) (alterations in original) (citations omitted). The "duty to develop the record is particularly

important where an applicant alleges he is suffering from a mental illnesses, due to the difficulty

in determining whether these individuals will be able to adapt to the demands or 'stress' of the

workplace." *Hidalgo v. Colvin*, No. 12-CV-9009 (LTS) (SN), 2014 WL 2884018, at *4

(S.D.N.Y. June 25, 2014) (citations and quotation marks omitted).

It is clear from a review of the record that there are gaps regarding Plaintiff's mental

health treatment, which the ALJ had a duty to develop further. Specifically, there are three gaps

in the treatment notes from MLK Health Center.[18]  First, there is an approximately six-month

long gap in treatment notes from March 30, 2009 until September 22, 2009.  However, Dr.

Hayden's letter dated May 4, 2009, indicates that he had been "follow[ing] [Plaintiff] for the past

nine months." (R. 243).  This suggests that Dr. Hayden was still seeing Plaintiff regularly in May

2009, and that there may be treatment notes from at least the late spring of 2009.  Second, and

most notably, is an approximately eighteen month gap in treatment notes, from October 16, 2009

until April 29, 2011.  There is ample evidence in the record, though, that suggests Plaintiff still

received treatment at MLK Health Center during that time.  For instance, Dr. Hayden wrote a

letter on August 2, 2010, in which he stated that he "indeed continu[ed] to treat her[.]" (R. 286).

In the Treating Physician's Wellness Plan Report that he completed on January 14, 2011, he

wrote that Plaintiff "has been crying on and off for four months." (R. 280).  He also checked a

box to indicate that she attended scheduled appointments. (R. 280).  This implies not only that he

was seeing Plaintiff in January 2011, but that he had been seeing her for at least the previous four

months.  Additionally, Plaintiff told the FEGS social worker in November 2010 that she had

been in psychiatric treatment for over two years, and was currently being treated by Dr. Hayden

on a monthly basis. (R. 261-62).  Furthermore, there are no treatment notes from MLK Health

Center that reflect Plaintiff's suicide attempt or hospitalization at Bronx-Lebanon in March 2011.

Combined, this evidence suggests that Plaintiff was treated at MLK Health Center during the

eighteen month period from October 16, 2009 to April 29, 2011, and there is no indication that

ALJ Barr satisfied her duty to develop the record by seeking treatment notes from that time.

Finally, there is a third gap in the treatment notes of approximately ten months, from July 11,

---

[18] While the Court acknowledges the possibility that Plaintiff did not receive mental health treatment during those gaps, the record suggests otherwise.  Although follow-up requests may ultimately reveal that Plaintiff was not treated during the gaps, ALJ Barr nevertheless had a duty to seek records from those time periods, and it does not appear that she made any such attempts.  The record only indicates that the first ALJ attempted to obtain records from Dr. Hayden once. (R. 15, R. 56).

2011 until May 19, 2012. However, treatment notes from Dr. Leggett dated May 19, 2012,

indicate that Plaintiff had been seen by a psychiatrist three months earlier, in February 2012,

which suggests that there may be treatment notes from that time period. (R. 471).

Moreover, the record suggests that Plaintiff was likely medicated continuously from 2008

through the date of her hearing in 2013. For example, at her hearing, Plaintiff's attorney

provided as evidence that she had been disabled since 2008 the longevity of her treatment and

the medication she was prescribed. (R. 315-16). Additionally, at various points throughout the

approximately five years in question, Plaintiff returned to MLK Health Center when she ran out

of medication. (*E.g.*, R. 464, R. 481). This is not surprising, given the "rather complex

psychiatric medication regimen" Plaintiff was prescribed. (R. 456). Finally, Dr. Hayden

indicated in his Treating Physician Wellness Plan Report dated January 14, 2011, that Plaintiff

was still taking her prescribed medications. (R. 280). This evidence suggests that Plaintiff was

medicated from the alleged onset date in 2008 through the date of her hearing in 2013, which

further implies that she received continual treatment at MLK Health Center, and that there are

likely treatment notes missing from the record, which ALJ Barr failed to obtain.

The Court also notes that, without these records, it would be difficult if not impossible for

ALJ Barr to properly analyze the criteria of Listings 12.04 and 12.06 for mental impairments

under the SSA's own regulations. For example, the "paragraph B" criteria required the ALJ to

look for "[r]epeated episodes of decompensation, each of extended duration," which "means

three episodes within [one] year, or an average of once every [four] months, each lasting for at

least [two] weeks." (R. 297). The "paragraph C" criteria under listing 12.04 included "repeated

episodes of decompensation." (R. 297). Given the significant gaps in the record, ALJ Barr was

not fully equipped to determine whether Plaintiff had repeated episodes of decompensation.

For the foregoing reasons, ALJ Barr did not fully develop the record, and the case should be remanded. On remand, this Court recommends that the ALJ should also seek the following: (i) a Medical Source Statement of Ability to Do Work-Related Activities (Mental) from Dr. Hayden; it appears that the first ALJ made one request for Dr. Hayden to complete such a form, but there is no indication that any follow-up requests were made, (R. 15, R. 56); (ii) the missing page of Dr. Hayden's treatment notes dated January 25, 2009, (R. 138), *see Truesdale v. Barnhart*, No. 03-CV-0063 (SAS), 2004 WL 235260, at *7 (S.D.N.Y. Feb. 6, 2004) (requiring ALJ to obtain missing page from consulting physician's report on remand); and (iii) opinions from Dr. Cozort,[19] Dr. Tiburcio and Dr. Barakat, all of whom were Plaintiff's treating physicians but did not provide opinions, *see id.* (remanding where, *inter alia*, the ALJ did not seek opinions from several treating physicians). The ALJ should also inform Plaintiff that she may seek opinions or testimony from her treating physicians. *Oliveras*, 2008 WL 2262618, at *7; *Jimenez v. Massanari*, No. 00-CV-8957 (AJP), 2001 WL 935521, at *11-12 (collecting cases regarding an ALJ's duty to inform a *pro se* plaintiff that she may seek a more detailed statement from her treating physician).

## D. The Treating Physician Rule

In determining an applicant's RFC, the ALJ must apply the treating physician rule, which requires the ALJ to afford controlling weight to the applicant's treating physician's opinion when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R.

---

[19] This Court submits that it is particularly important to seek an opinion from Dr. Cozort. There are several indications that she treated Plaintiff for psychotherapy regularly, and, if there are additional treatment notes, they may reveal the same. (*E.g.*, R. 190 (Dr. Hayden noted that Plaintiff agreed to see Dr. Cozort for psychotherapy once weekly); R. 216 (Plaintiff told Dr. Meadow that she attended weekly therapy); R. 313-14 (Plaintiff testified that she had weekly therapy with "Ms. Marissa;" it is possible that she was referring to Dr. Cozort, whose first name is Marina.)).

§§ 404.1527(c)(2), 416.927(c)(2). Thus, "'[a] treating physician's statement that the claimant is disabled cannot itself be determinative.'" *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir. 2003)). Moreover, if there is substantial evidence in the record that contradicts or questions the credibility of a treating physician's assessment, the ALJ may give that treating physician's opinion less deference. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (refusing to give controlling weight to treating physicians' opinions, as they were not supported by substantial evidence in the record); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (same); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (same).

To discount the opinion of a treating physician, the ALJ must consider various factors and provide a "good reason." 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). These factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency with the record as a whole; (5) the specialization of the treating physician; and (6) other factors that are brought to the attention of the Court. *See Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

The Second Circuit has made clear that the ALJ need not "slavish[ly] recit[e] . . . each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013); *see also Molina v. Colvin*, No. 13 Civ. 4701(GBD)(GWG), 2014 WL 2573638, at *11 (S.D.N.Y. May 14, 2014) (collecting cases). What is required, however, is that the ALJ provide "good reasons" when not affording controlling weight to a treating physician's opinion. *Selian*, 708 F.3d at 419 (citing *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir. 1999); 20 C.F.R. § 404.1527(c)(2)); *see also Petrie*, 412 F. App'x at

407 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)) ("[W]here 'the evidence of record permits [the Court] to glean the rationale of an ALJ's decision, [the Court] do[es] not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'").

ALJ Barr gave "little weight" to Plaintiff's treating physician Dr. Hayden, and "some weight" to her treating physician Dr. Leggett. (R. 299). She justified this by finding that Dr. Leggett's opinion was "inconsistent with the medical evidence as a whole and not supported by the record," and that Dr. Hayden's opinion was, *inter alia*, "inconsistent with records submitted by Dr. Leggett[,] as well as the reports of the consultative examiners." (R. 299-300). Instead, she gave "significant weight" to consultative examiner Dr. Broska. (R. 299). She also gave "some weight" to consultative examiner Dr. Meadow and state agency mental health consultant Dr. Kamin. (R. 299).

First, in light of Dr. Meadow's criminal record, this Court recommends that his opinion should not be credited. *See Burgess v. Colvin*, No. 15-CV-9585 (RLE), 2016 WL 7339925, at *14 (S.D.N.Y. Dec. 19, 2016) (remanding where ALJ assigned Dr. Meadow's opinion significant weight, finding that because Dr. Meadow had "since pleaded guilty to healthcare fraud . . . the risk of legal error is too high and the case should be remanded."); *cf. Ortiz*, 2017 WL 519260, at *9 (granting Commissioner's motion for judgment on the pleadings despite opinion evidence from Dr. Meadow where the ALJ gave Dr. Meadow's opinion "less than controlling, if any, weight[.]"). Next, the opinions of Dr. Broska and Dr. Kamin do not constitute substantial evidence such that Plaintiff's treating physicians' opinions should have been discounted under the treating physician rule. Although a consultative examiner's opinion

-40-

may constitute substantial evidence, *see Mongeur v. Heckler*, 722 F.2d 1033 (2d. Cir 1983), in light of the ALJ's failure to develop the record, discussed *supra* Section II(C), that proposition does not apply to the instant case.

Indeed, "the 'treating physician rule' is inextricably linked to the duty to develop the record." *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012); *see also Oliveras*, 2008 WL 2262618, at *6 (noting that the duty to develop the record "dovetails with the treating physician rule."). Therefore, until an ALJ satisfies the "'threshold requirement'" under the duty to develop the record, "'the ALJ cannot even begin to discharge his duties . . . under the treating physician rule.'" *Oliveras*, 2008 WL 2262618, at *6 (alteration in original) (quoting *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003)).

For the foregoing reasons, the ALJ failed to properly apply the treating physician rule, which is further grounds on which the case should be remanded.

## E. Substantial Evidence

The Commissioner contends that the ALJ's decision was supported by substantial evidence. (Docket No. 14). However, "[w]here the ALJ has failed to develop the record, a reviewing court 'need not—indeed, cannot—reach the question of whether the Commissioner's denial of benefits was based on substantial evidence.'" *Oliveras*, 2008 WL 2262618, at *8 (quoting *Jones v. Apfel*, 66 F. Supp. 2d 518, 542 (S.D.N.Y. 1999)); *see also Truesdale*, 2004 WL 235260, at *7 ("[B]ecause the Commissioner failed to fully develop the record . . . [the court] cannot conclude that the Commissioner's finding of no disability is supported by substantial evidence.'"). Therefore, "any review of whether the decision was based on substantial evidence must be deferred until the record is complete." *Oliveras*, 2008 WL 2262618, at *8.

## F. Compliance with the Appeals Council's Remand Order

The Appeals Council specifically directed ALJ Barr to: (i) evaluate Plaintiff's mental impairments in accordance with the special technique described in 20 C.F.R. § 416.920a, and document her application of the technique by providing specific findings and appropriate rationale for each of the functional areas described in 20 C.F.R. § 416.920a(c); (ii) give further consideration to Plaintiff's mental RFC, including whether she could understand, carry out and remember instructions, and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations; and (iii) obtain evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base, pursuant to Social Security Ruling 83-14. (R. 346-47; *see also* R. 294).

While ALJ Barr complied with the Appeals Council's first and third instructions to this Court's satisfaction, she did not fully comply with the second. First, ALJ Barr did comply with the Appeals Council's instruction to apply the special technique described in 20 C.F.R. § 416.920a.[20] ALJ Barr addressed the "four broad functional areas in which [the SSA] rate[s] the degree of [a claimant's] functional limitation: [a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation," 20 C.F.R. § 416.920a(c)(3) (2011) (citing 12.00C of the Listing of Impairments), and provided findings and rationale for each of the four functional areas. (R. 297). However, the ALJ did not fully comply with the Appeals Council's second instruction to give further consideration to Plaintiff's mental RFC. Although she did provide rationale with specific references to evidence in the record in support of Plaintiff's assessed limitations, she did not specifically consider whether Plaintiff

---

[20] 20 C.F.R. § 416.920a was modified on January 17, 2017. The Court applies the previous version of 20 C.F.R. § 416.920a, which was effective from June 13, 2011, through January 17, 2017, as that is the version that was in effect at the time of ALJ Barr's decision on November 14, 2013. (R. 301).

could understand, carry out and remember instructions, as the Appeals Council directed. (R. 347). Finally, ALJ Barr did comply with the Appeals Council's direction to obtain evidence from a vocational expert regarding the effects of the assessed limitations on Plaintiff's occupational base. (R. 300-01).

ALJ Barr's failure to fully comply with the Appeals Council's second instruction provides further reason why the case should be remanded.

## III. CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that the Commissioner's Motion for Judgment on the Pleadings should be denied, and the Commissioner's decision be vacated and the case be remanded for further proceedings consistent with this Report and Recommendation.

## IV. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time). If copies of this Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d). Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Cathy Seibel at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Cathy Seibel and not to the undersigned. Failure to file timely objections to this Report and

Recommendation will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   April 13, 2017
         White Plains, New York

**RESPECTFULLY SUBMITTED,**

JUDITH C. McCARTHY
United States Magistrate Judge